ALLISON CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Allison Corp. v. Commissioner
Docket No. 8147-75.
United States Tax Court
T.C. Memo 1977-166; 1977 Tax Ct. Memo LEXIS 280; 36 T.C.M. (CCH) 689; T.C.M. (RIA) 770166; May 31, 1977, Filed Sidney Gelfand, for the petitioner. Bernard S. Mark, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined the following deficiencies in petitioner's Federal corporate income taxes: Taxable Year Ended
Deficiency
July 31, 1972
$10,944
July 31, 1973
10,944
The sole issue herein is how much of the amounts which it paid to Loulu Seltzer, one of its officers and directors, petitioner may deduct as reasonable compensation for personal services. FINDINGS OF FACT The parties have filed a stipulation of facts and a supplemental stipulation of facts, both of which, together with the *281 exhibits attached thereto, are incorporated herein by this reference. Petitioner Allison Corporation ("Allison") was incorporated on August 12, 1960, under the laws of the State of New Jersey. At the time of the filing of its petition herein, petitioner's principal office was located at 200 South Avenue, Garwood, New Jersey. For its fiscal years ended July 31, 1968, through July 31, 1973, it maintained its books and records and filed its Federal income tax returns on an accrual basis. Loulu Seltzer ("Loulu") was born on August 31, 1897. After some training and experience as a bookkeeper, she entered the textile business with her husband Moses Seltzer ("Moses"). They were at first "converters" and jobbers and later importers and processors of raw silk. While Loulu shared in the overall direction and control of their businesses, her efforts were concentrated primarily in the financial management of the enterprises. Allison was started by Moses and Loulu, their son Samuel Seltzer ("Sam"), and an unrelated individual, Saul Dennison ("Saul"). Because Saul did not at the outset make any investment in the corporation, Allison's capital stock was initially issued as follows: *282 Type of Stock Stockholder
Common
Preferred
Moses Seltzer
150
450
Loulu Seltzer
150
450
Samuel Seltzer
200
600
Total
500
1,500
The par value of each share of both classes of stock was $100. The principals of Allison had intended from the beginning that the business would eventually pass into the control of Sam and Saul equally. Moses died in May, 1965, and all of his stock in the company -- both common and preferred -- passed to his widow Loulu. In mid-1967, Loulu, Sam, and Saul deemed it advisable, in the interest of realizing their original intentions, to make certain changes in the capital structure and stock ownership of the corporation. Thus, in early May, 1967, both the directors and the shareholders of Allison Corporation (i.e., Loulu and Sam) [1] approved a recapitalization of the corporation. By this recapitalization the then outstanding 500 shares of common stock were changed into (a) 250 shares of "Class A" common stock with full voting rights and (b) 250 shares of "Class B" common stock with no voting rights at all. The par value of each share of common stock remained $100. The then outstanding 1,500 shares of preferred *283 stock were made non-voting, and dividends thereon were reduced to five percent per annum, non-cumulative. Stock certificates reflecting the recapitalization were issued on June 15, 1967. As a result of the recapitalization the stock of Allison was, on July 10, 1967, held as follows: Type of Stock Stockholder
Class A Common
Class B Common
Preferred
Samuel Seltzer
100
100
600
Loulu Seltzer
150
150
900
On July 10, 1967, Loulu, Sam, Saul, and Allison entered into an agreement designed to effectuate a shift in the ownership of the newly reclassified Allison stock. Pursuant to the terms *284 of this agreement, Saul acquired all of the Class B common stock; he purchased 100 shares from Sam and 150 shares from Loulu. At about the same time, Sam bought from his mother the 150 shares of Class A common stock which she then owned.All of the stock transferred in these three transactions was sold at its par value of $100 per share, in accordance with the parties' original expectations. The July 10, 1967, agreement also granted Saul an option to purchase, at par plus accrued dividends, up to one-half of all the Allison preferred stock (except for treasury stock) outstanding at the time the option was exercised. Moreover, the agreement provided that when and if Saul became the owner of one-half of Allison's preferred stock, the company's certificate of incorporation would be amended so as to make his Class B common stock equal in voting rights to (and identical in all other respects with) the Class A common stock. As of August 1, 1967, the net book value of Allison's assets was $340,098.21.
Between 1967 and 1973, Loulu disposed of her Allison preferred stock by making gifts to her children (i.e., Sam and his two sisters) and to her grandchildren. Sam subsequently, but at *285 a time not clearly revealed by the record, purchased their preferred stock from the other members of his family. Then, in August, 1975, Saul exercised his option under the 1967 agreement, and so, in accordance with that agreement, he and Sam became the equal co-owners of Allison. Allison was in the business of selling two different categories of automobile-related products. Originally Allison's business had been limited to the manufacture and sale of "soft goods" such as automobile seat slip covers, air cooled or ventilated seat cushions, and wedge seat cushions. These soft goods were generally sold directly to retailers, and, during 1972-1973, Allison had approximately 20 percent of the market for these items. This portion of Allison's business fluctuated significantly according to the season of the year; the level of activity typically reached a peak in the spring and a low point in the fall. During the mid-1960's Allison began to import and sell a wide variety of automobile accessories or "gadgets", including small tools, dashboard trays, mirrors, ash trays, and hundreds of other items. Allison expanded into this field in part to overcome the seasonal nature of its soft *286 goods business. In contrast to its many competitors in this area, who generally bought whatever merchandise was made available to them, Allison has always been actively involved with the manufacturers in the design of the products which it imported. Moreover, in more recent years, it has begun to manufacture some accessories itself. It sells accessories either directly to retailers or to distributors who in turn supply the retail outlets. Allison was, from the outset, managed by the cooperative efforts of the Seltzers -- Moses, Loulu and Sam -- and Saul Dennison. Initially, Moses was the president and was primarily concerned with obtaining supplies, credit, and customers. He worked most closely with Saul who was in charge of sales. At the same time, Sam, as vice president, ran the plant, while Loulu, as the corporate secretary and treasurer, handled the office, money, and banking. After Moses' death in 1965, Allison continued its operations much as it had before, with each of the three remaining principals assuming some of Moses' former duties. Although Sam became president of the corporation, the overall direction and control of the business continued to be shared, to a *287 large extent, among Loulu, Saul, and Sam. Sam and Saul each have an enclosed office in Allison's office building, while Loulu shares a larger office with seven other employees who are subordinate to her. Loulu began working for Allison when the corporation was first organized in 1960, and she continued working there on a full-time basis at least through the taxable periods now in question. During Allison's fiscal years ending July 31, 1972, and July 31, 1973, Loulu performed a wide variety of services for the corporation.Her duties included not only routine administrative tasks but also supervisory and control functions. In addition, she helped to formulate general corporate policies. In the first place, Loulu was in overall charge of Allison's administrative office. Part of this aspect of her work involved management of accounts receivable. In this connection, she supervised the work both of Ted Coraggio ("Ted"), who was the corporation's "credit and office manager", and of a Mr. Gittes, who was its "accounts receivable supervisor". Moreover, Loulu not only watched over existing accounts to insure that Allison was paid on time, but also, in conjunction with Sam, Saul, and *288 Ted, she determined how much credit was to be extended to any particular account. However, Ted -- not Loulu -- actually communicated with the customers in connection with their accounts. In addition, Loulu was fully responsible for Allison's accounts payable. When any questions arose, she determined, in conjunction with Frank Dolan ("Frank"), the company's general operations manager, whether the correct quantity and quality of materials had been received so that an account was properly payable. Furthermore, she controlled the actual payment of the corporation's accounts, because, during the years in question, only she and Sam signed checks issued by Allison, and she, in fact, signed the preponderance of the corporate checks. Loulu also took an interest in the operations of Allison's manufacturing plant. She would tour the plant from time to time to determine if the employees were working properly. And when she discovered a sloppy or lazy worker, she would report her discovery to Frank or Sam. She also watched over the company's manufacturing payroll expenses and would question Frank when she thought they were too high. During the years in question Loulu managed Allison's *289 cash flow. She would anticipate the cash required by the business for the production or acquisition of inventory and also the cash which would be generated by future sales. When necessary she would arrange for bank loans to Allison. The extent of these loans is described infra at p. 16. And, if the cash required for projects which had been ordered by Sam or Saul seemed excessive, she would have Frank delay implementation of the plans until she conferred with Saul and Sam. However, the ultimate decision to proceed with or to abandon a project was made by Sam. Most of Allison's major corporate decisions resulted from discussions among Loulu, Saul, and Sam. They discussed, for example, what products Allison should import or manufacture, what the design of those products should be, and how they should be packaged. In the course of these discussions, Loulu had argued forcefully in favor of Allison's entry into the accessory field as a means of overcoming the highly seasonal nature of its soft goods business. And her lifelong experience with textiles was especially valuable in helping Allison choose fabrics. Not only was she able to select aesthetically pleasing colors and *290 designs, but also she knew how to obtain suppliers and to evaluate the quality of materials. At the same time, Loulu was involved in the planning and implementation of Allison's three successive changes in the location of its plant and office facilities. And finally, Loulu participated in the hiring of all key personnel and in the determination of their salaries. She also helped fix the general level of salaries for all other employees of Allison. During the fiscal years ended July 31, 1972, and July 31, 1973, both Sam and Saul travelled extensively in connection with their business. Sam took from two to six trips to Japan, Hong Kong, Taiwan and Korea during these fiscal years, each trip lasting approximately 20-30 days. Saul travelled throughout each year in an unending series of short domestic business trips to meet with customers of the corporation. Loulu, by contrast, was not required to travel on the corporation's business and was present in the corporation's offices virtually every working day. Moses last received compensation from Allison on May 21, 1965. From the beginning of that year, until the week ended May 21, 1965, he had been paid $350 per week. However, *291 his salary for the fiscal year ending July 31, 1965, had apparently been set as $32,200. [2] Sam received $46,600 in the fiscal year ending July 31, 1965, and $49,000 in the succeeding fiscal year. Although, as stated above, Loulu worked for Allison on a full-time basis from the time the corporation was organized, she first began to receive compensation from the company as of August 1, 1965, shortly after Moses' death. Her salary for the fiscal year ending July 31, 1966, was set at $32,400. She had not been paid a salary prior to that time in order to help the corporation minimize its expenses; because her husband had been supporting her, she felt her salary would have been an unnecessary burden. Allison's corporate by-laws provide that officers of the corporation "shall receive such salary or compensation as may be determined by the Board of Directors". During the two years in issue, Allison's board of directors was composed of Sam and Loulu, who were also its officers. [3] And Allison's corporate minutes contain no resolutions of the board of directors setting the salaries of the company's officers. However, the salaries *292 which were to be paid to Allison's employees in the coming year, were in fact set near the end of the then current fiscal year by Loulu, Saul, and Sam.And, at the same time, the three of them would discuss and agree upon the salaries which they themselves would receive for the coming year. Saul, as well as Sam and Loulu, agreed that Loulu should be paid the amounts in question. During its fiscal years ended July 31, 1968, through July 31, 1973, inclusive, Allison's payroll records indicate that it paid the amounts set forth below as compensation to certain of its employees: Samuel Seltzer, President and Director 1968
1969
1970
1971
1972
1973
45,500
58,200
77,200
94,200
109,800
109,800
Saul Dennison, Sales Executive
42,500
55,200
71,800
91,200
106,800
106,800
Loulu Seltzer, Treasurer, Secretary and Director
30,600
37,000
42,000
55,000
62,800
62,800
Frank Dolan, Manager of Plant Operations
15,760
17,940
21,800
24,260
29,800
32,400
Credit and Office Manager.
John Putrino *
Theodore Coraggio **
8,830
8,940
-
-
18,300
20,900
*293 Allison accordingly deducted as compensation the amounts shown above. Allison's Federal income tax returns reflect the following: Allison Corporation Synopsis of Data from Federal Income Tax Returns and Ratios Derived Therefrom Year Ended
7/31/68
7/31/69
7/31/70
7/31/71
7/31/72
7/3173
1 Sales
$1,892,294
$2,194,406
$2,398,840
$3,049,628
$3,681,931
$4,34,001
2. Taxable Income
41,282
59,561
83,639
122,846
180,448
208,373
3. Compensation of Officers
76,100
95,200
119,200
149,200
172,600
172,600
4.Taxable Income Before
Officers' Salaries
117,382
154,761
202,839
272,046
353,048
380,973
5. Compensation of Loulu
Seltzer
30,600
37,000
42,000
55,000
62,800
62,800
6. Total Salaries Other Than
Officers
402,341
520,787
542,018
598,353
681,041
747,614
7. Other Salaries (Line 13 of
Tax Return)
112,687
137,329
151,222
192,765
236,168
244,400
8. % of Loulu Seltzer's Salary
to Sales (Line 5 / Line 1)
1.62
1.69
1.75
1.80
1.71
1.44
9. % of Loulu Seltzer's Salary to
Taxable Income Before Officers'
Salaries (Line 5 / Line 4)
26.07
23.91
20.71
20.21
17.89
16.48
10. % of Total Salaries Other Than
Officers to Sales (Line 6 /
Line 1)
26.02
23.73
22.60
19.62
18.50
17.17
11. % of "Other Salaries" to Sales l(Line 7 / Line 1)
5.96
6.26
6.30
6.32
6.41
5.61
*294 During its fiscal years ending in 1968 through 1973, Allison's taxable income and unappropriated retained earnings increased as follows: Unappropriated Year
Taxable Income
Retained Earnings
1968
$ 41,282
$ 167,162
1969
59,562
202,746
1970
83,639
250,493
1971
122,846
319,907
1972
180,448
420,803
1973
208,373
536,606
Allison never paid any dividends during the period August 12, 1960, through July 31, 1973. However, its freedom of choice in this respect was limited by the Chase Manhattan Bank which, as a condition of making loans to the corporation, required that no dividends be paid. Allison employed significant amounts of borrowed capital in the conduct of its operations. A large part of these funds was obtained from Chase Manhattan, either in accordance with Letters of Credit or on the basis of discounted corporate notes. During the two tax years in issue, Allison's indebtedness to the bank ranged from approximately $175,000 to slightly more than $1,000,000; the corporation owed between $400,000 and $900,000 in 16 of the 24 months involved. As was required by the bank, both Sam and Loulu gave their personal unlimited guarantees *295 as additional security for these loans. In addition to the amounts which it borrowed from Chase Manhattan, Allison obtained substantial loans from Loulu and Sam. The month-end balances of the company's indebtedness to Loulu stood at either $118,000 or $128,000 throughout most of the two years under consideration. [4]Allison paid Loulu interest in respect of these funds which it was borrowing from her. The Commissioner allowed Allison a deduction of only $40,000 of the $62,800 which it paid Loulu during each of the fiscal years ended July 31, 1972, and July 31, 1973. No deduction was allowed for the portion of the salary in excess of $40,000 in either year because: It [was] determined that compensation paid Loulu Seltzer during [each year, was] excessive in the amount of $22,800. Such amount exceeds a reasonable allowance for salaries or other compensation for personal services actually rendered * * * Petitioner claims that the entire $62,800 is properly deductible in each year, either as reasonable *296 compensation for personal services, or as compensation for Loulu's actions in guaranteeing Allison's borrowings from the Chase Manhattan Bank and in lending additional funds to the company. OPINION Section 162(a), I.R.C. 1954, allows a taxpayer to deduct ordinary and necessary business expenses, including "a reasonable allowance for salaries or other compensation for personal services actually rendered". An amount paid to an employee is deductible pursuant to these provisions only if it is both "payment purely for services" and "reasonable" in amount. Section 1.162-7(a), (b)(1) and (3), Income Tax Regs.; Harolds Club v. Commissioner,340 F. 2d 861, 867 (C.A. 9), affirming a Memorandum Opinion of this Court; Long Island Drug Co. v. Commissioner,111 F. 2d 593, 594 (C.A. 2), affirming 35 B.T.A. 328, cert. denied 311 U.S. 680.
Petitioner Allison Corporation paid Mrs. Loulu Seltzer, one of its officers and directors, $62,800 in respect of each of the taxable periods before us. Allison deducted these *297 payments, pursuant to section 162(a)(1), as compensation for services rendered. However, the Commissioner determined that the compensation paid in each year was "excessive in the amount of $22,800" and disallowed that portion of the claimed deduction. The taxpayer bears the burden of proving that it is entitled to the deduction which it claims. Botany Worsted Mills v. United States,278 U.S. 282; Welch v. Helvering,290 U.S. 111; Rule 142(a), Tax Court Rules of Practice and Procedure. We hold that petitioner has met its burden. The reasonableness of compensation paid an employee is "to be determined on the basis of the particular circumstances in each case". Pepsi Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567, affirmed 528 F. 2d 176 (C.A. 10); Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591. However, certain criteria have been identified as especially relevant and, as such, have been relied upon consistently in cases of this type. These criteria were set forth concisely *298 in Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (C.A. 6), reversing a Memorandum Opinion of this Court, where, in language which has on numerous occasions been repeated and adopted by this Court, it was said: Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * Of course, in cases such as this one, *299 which involve closely-held corporations and intra-family transactions, proper application of those criteria requires most careful scrutiny of all the facts and circumstances. Tulia Feedlot, Inc. v. Commissioner,513 F. 2d 800, 805 (C.A. 5); Darco Realty Corporation v. Commissioner,301 F. 2d 190, 191 (C.A. 2); Mennuto v. Commissioner,56 T.C. 910, 921; Perlmutter v. Commissioner,44 T.C. 382, 401-402, affirmed 373 F. 2d 45 (C.A. 10); cf. Cole v. Commissioner,481 F. 2d 872, 876 (C.A. 2).And contrary to petitioner's assertion, this Court is not bound by the opinion evidence of petitioner's witnesses, even though the Commissioner presented no testimony to contradict their opinions. Pepsi Cola Bottling Co. of Salina, Inc. v. Commissioner,supra, 528 F. 2d at 181; Perlumtter v. Commissioner,supra,44 T.C. at 403; cf. R. J. Nicoll Co. v. Commissioner,59 T.C. 37, 49-50. The evidence presented by petitioner clearly establishes *300 that Loulu Seltzer performed extensive and valuable services for the corporation in each of the two years here in issue, and we do not understand the Commissioner to argue otherwise. In the first place, Loulu served as the corporation's treasurer and office manager, taking primary responsibility for its administrative and financial affairs. In this capacity she oversaw the corporation's books of account, supervised its accounts receivable and the granting of credit to its customers, worked closely with its plant manager in the verification and payment of its accounts payable, and tracked its cash flow and cash needs, arranging bank loans when necessary. Sam, as corporation president, relied on Loulu to take care of all routine matters and to bring to his attention any special problems. In addition to her specific duties in respect of the corporation's finances Loulu served as one of the three members of the company's overall management team. Although Sam could exercise the final authority, he discussed all major decisions with his two "partners", Loulu and Saul, and the three worked together, closely and consistently, to make the corporation successful in a competitive and volatile *301 industry. Loulu was well qualified to serve in this capacity, having devoted long years with her husband to the establishment and running of a successful textile products business. She was especially qualified by virtue of her experience to make decisions in the area of fabric selection, advertising and packaging design. She was, moreover, instrumental in pushing for the corporation's expansion into the automobile accessory importing business, an expansion which produced much of the corporation's growth and profits in the years here in issue. Loulu's position in the company's management team was formalized by her status as a member of the corporation's board of directors and as one of its two officers. She was the only one of the managing triumvirate who did not travel extensively each year; during their absences both Sam and Saul relied upon Loulu to exercise executive responsibility for the operation of the business. Like Sam, Loulu was required by the Chase Manhattan Bank to give her personal guarantee in order for the corporation to obtain necessary loans. The salaries of all corporate personnel, including Sam, Saul and Loulu, were set by the three members of the management *302 team in informal meetings at the end of each fiscal year with respect to the upcoming fiscal year. The pattern of salaries that persisted throughout the years here in question seems to have emerged in 1965, shortly after the death of Moses Seltzer. Prior to his death in May, 1965, Moses, as president, had received an annual salary of $32,200, while Sam, as vice-president, had received an annual salary of $46,600. Loulu received no salary. The level of Moses' salary and the fact that Loulu received no salary at all, despite the fact that she performed valuable services in each of the years 1960-1965, reflected the parties' desire to minimize expenses and keep working capital in the corporation. After Moses' death, Sam, Saul, and Loulu each took over some of the functions which Moses had previously performed, with Sam stepping up to the position of president of the corporation. Sam's salary was set at $49,000 for the fiscal year ending July 31, 1966, while Loulu was granted a salary of $32,400. Two years later, in the fiscal year ending July 31, 1968, the following salaries were paid: Sam
$45,500
Saul
42,500
Loulu
30,600
Frank Dolan
15,760
We conclude *303 that these salaries represented the management team's reasonable estimate of the value to the corporation of the services actually performed by each of the employees. It is true that the members of the management team were not disinterested parties and that Saul, although not related to Sam and Loulu, had reason to feel close personal ties to them. It is also true that, at least prior to Moses' death, nonbusiness considerations had impinged upon salary decisions. Nonetheless, the corporation was becoming quite successful in the period 1966-68 and was able to pay substantial salaries to the employees responsible for its success. The aggregate salaries paid its four prime employees do not appear unreasonable in light of the corporation's sales, net income, and profits. Nor does the division appear unreasonable. While Loulu's salary reflected the fact that her services were to some extent less valuable than those of Sam or Saul, it also reflects the fact that she bore significantly more responsibility than the plant manager, Frank Dolan. As treasurer and office manager, she performed services which might be considered comparable to Dolan's. But in addition, she exercised executive *304 responsibilities, served as a director and officer, and provided extraordinary services such as guaranteeing corporate loans. Moreover, she had served without compensation for a period of five years, and the corporation was entitled to take such past service into account in setting her salary. Lucas v. Ox Fibre Brush Co.,281 U.S. 115. We note, too, that the Commissioner did not challenge the reasonableness of any of the salaries paid by petitioner in any of the years from 1965 to 1968. Cf. Ridgewood Provisions, Inc. v. Commissioner,6 T.C. 87, 90. During the period between 1968 and the years here in question, petitioner flourished. It captured approximately 20 percent of the U.S. market for its domestic manufactured goods, and became a major supplier of the various automotive accessories it imported. Its gross sales increased from $1.9 million in fiscal 1968 to $4.4 million in fiscal 1973, its taxable income before officers' salaries from $117,382 to $380,973, and its taxable income from $41,282 to $208,373. Much of this success derived from petitioner's decision to expand into the automotive accessories business, an expansion strongly advocated *305 by Loulu. As a result of the corporation's expansion, Sam, Saul, Loulu, and Frank all took on added responsibilities and received added compensation. The relationship of their salaries remained more or less constant, however, as the amounts increased to the following: Percent
Fiscal Year
Fiscal Year
Fiscal Year
Increase
ended 1971
ended 1972
ended 1973
1968-73
Sam
$94,200
$109,800
$ 109,800
141
Saul
91,200
106,800
106,800
151
Loulu
55,000
62,800
62,800
105
Dolan
24,260
29,800
32,400
106 Between 1968 and 1973, Loulu's salary decreased both as a percentage of sales (from 1.62 to 1.44) and as a percentage of taxable income before officers' salaries (from 26.07 to 16.48). And we note, again, that the Commissioner did not challenge the reasonableness of petitioner's salary payments prior to fiscal year 1972, although Loulu's salary reached a level of $55,000 in fiscal year 1971. Furthermore, he did not challenge the reasonableness of the salaries paid to Sam and Saul in the years at issue here, despite the fact that they were well above that paid Loulu. We conclude, on the basis of the evidence presented, that Loulu's *306 salary of $62,800 in each of the fiscal years 1972 and 1973 was determined on the basis of a rational corporate salary policy consistently applied over a period of some eight years, that it represented compensation for services actually performed by Loulu for the corporation, and that it was not unreasonable in amount. The Commissioner has stressed three points in arguing that his determination should be upheld.First, of course, is the fact that Loulu, Sam, and Saul all had substantial financial and personal investments in petitioner as well as long-term personal ties among themselves. They were hardly disinterested decision-makers when they set their salaries each year. Nonetheless, these ties of various sorts among the decision-makers and their corporation do not establish that the salaries set were necessarily unreasonable. And they may suggest, indeed, that Loulu received less than she deserved because she was willing, for personal reasons, to contribute her considerable services to the enterprise. Secondly, the Commissioner points to the fact that petitioner paid no dividends in any year up to and including fiscal years 1972 and 1973, despite considerable earnings. See *307 Tulia Feedlot, Inc. v. United States,supra, 513 F. 2d 800, 803 (C.A. 5). Here, however, the corporation's need for working capital, as well as the requirements of its bank, counselled against the payment of dividends. And, despite the close personal ties between Loulu and petitioner's other stockholders, we give some weight to the fact that the payments challenged here were not pro rata distributions and went to a person with only a limited preferred stock interest in the company. Finally, the Commissioner points to the absence of expert testimony as to the value of Loulu's services, and of evidence as to salaries paid by comparable corporations to comparable employees. Such evidence, if convincing, may indeed be highly significant. Cf. Faucette Co., Inc. v. Commissioner,17 T.C. 187, 196. It is not, however, indispensable, where the petitioner has presented other competent, relevant and credible evidence of the reasonableness of salaries paid. Mayson Manufacturing Co. v. Commissioner,supra,178 F. 2d 115, 121; Faucette Co., Inc. v. Commissioner,supra; *308 cf. Perlmutter v. Commissioner,supra,44 T.C. 382, 403. And in this case, petitioner Allison Corp. has introduced alternative evidence which we have found persuasive, notwithstanding that it consisted in part of the testimony of interested witnesses.Beyond this, we note that the Commissioner was at liberty to offer comparative evidence or expert testimony in support of his position, but did not do so. Thus on the basis of the record as a whole, we hold that petitioner has met its burden of proving that the salary paid Loulu Seltzer in each of the years in issue was reasonable. Mayson Manufacturing Co. v. Commissioner,supra,178 F. 2d 115, 121-22. [5] Therefore, petitioner was entitled to the deductions claimed in its return. *309 Decision will be entered for the petitioner. Footnotes
1. Both the "Waiver of Notice of Special Meeting of Board of Directors of Allison Corporation" and the "Waiver of Notice of Special Meeting of Stockholders of Allison Corporation" were signed not only by "Loulu Seltzer" and "Sam Seltzer" but also by one otherwise unidentified "Marilyn Seltzer" ostensibly in the capacity of a director and a stockholder. Although the signature of Marilyn Seltzer is also affixed to certain other corporate documents, the record does not contain any satisfactory explanation of what interest, if any, she may have had in Allison.↩
2. The discrepancy is not explained by the record.↩
3. See, however, fn. 1, supra,↩ at p. 4.
*. Employment terminated 8/10/69 ↩
**. Employment commenced 2/1/71↩
4. The only exceptions were the months of July, 1972, and July, 1973, when the ending balances were zero. We attribute little significance to these year-end variations.↩
5. The Third Circuit, to which appeal in this case would lie, has recently had occasion to express its understanding of the burden of proof in tax cases. See Demkowicz v. Commissioner,     F. 2d    , 39 A.F.T.R. 2d 77-1158 (C.A. 3), reversing on the substantive issue a Memorandum Opinion of this Court; Baird v. Commissioner,438 F. 2d 490, 493↩ (C.A. 3), vacating and remanding on other grounds a Memorandum Opinion of this Court.