HENRY SHOTMEYER AND CHARLOTTE SHOTMEYER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; SHOTMEYER BROS. PETROLEUM CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
SHOTMEYER v. COMMISSIONER
Docket Nos. 2253-78; 2254-78.
United States Tax Court
T.C. Memo 1980-238; 1980 Tax Ct. Memo LEXIS 344; 40 T.C.M. (CCH) 589; July 8, 1980, Filed *344 Held: Respondent challenged reasonableness of salary of petitioner in docket No. 2253-78 and its corollary deduction by petitioner in docket No. 2254-78. Salary reasonable and hence distributions by corporate petitioner deductible. Francis X. McCormick and Bruce P. Ogden, for the petitioners. Robert H. Williams, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In statutory notices of deficiencies dated December 20, 1977 respondent determined deficiencies in income taxes as follows: Henry and Charlotte Shotmeyer Docket No. 2253-78
Year
Year
1973
$ 4,548
1974
5,256
1975
11,671
*345 Shotmeyer Bros. Petroleum Corp. Docket No. 2254-78
Year
Amount
1973
$63,917
1974
83,228
1975
58,224
These cases were consolidated for the purposes of trial, briefing and opinion. After concessions by the parties the only issue remaining is whether compensation paid by Shotmeyer Bros. Petroleum Corp. to petitioner Henry Shotmeyer, in excess of $15,600 per year during each of the taxable years 1973, 1974 and 1975 was reasonable within the meaning of section 162, I.R.C. 1954. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time of filing their petition, petitioners Henry Shotmeyer, Sr. and Charlotte Shotmeyer, husband and wife, resided in Franklin Lakes, New Jersey. Petitioners timely filed their income tax returns with the Internal Revenue service for the taxable years 1973, 1974 and 1975 utilizing the filing status of married filing jointly. At the time of filing its petition herein, Shotmeyer Bros. Petroleum Corp. (Shotmeyer Petroleum) had its principal place of business in Hawthorne, *346 New Jersey. Shotmeyer Petroleum, an accrual basis taxpayer, timely filed its corporate income tax returns for the calendar years 1973, 1974 and 1975 with the Internal Revenue Service. Shotmeyer Petroleum, at all times pertinent hereto, was a New Jersey corporation, incorporated in 1946, with its principal business being that of a wholesale distributor of Mobil Oil Corp. gasoline and related products, including tires, batteries and accessories. Prior to 1971 Mr. Shotmeyer and his brother, Albert Shotmeyer (Albert), each owned a 50 percent interest in Shotmeyer Petroleum. In 1971 and continuing through the years here in issue, Mr. Shotmeyer was the sole owner of all the capital stock thereof. Beginning in 1971 and continuing through the years here in issue, Mr. Shotmeyer was the president and chief executive of Shotmeyer Petroleum. Also beginning in 1972 petitioners' two sons, Charles P. and Henry Shotmeyer, Jr. (hereinafter Charles and Henry) were officers and members of the board of directors. Charles graduated from the University of Pennsylvania, Wharton School of Business, with a B.A. degree in Marketing and Finance. Subsequent to his graduation he was employed as an executive *347 trainee by the Mobil Oil Corp. After working for 3 years with Mobil's Midwest Marketing Division, Charles, in 1966, began his employment with Shotmeyer Petroleum. Charles has been exposed to high-level negotiations with several major oil companies, including Mobil, Getty, Citco, Exxon, Ashland, Tenneco, Texaco, Arco and Shell. Charles is extremely capable and knowledgeable in all areas of the petroleum industry and would qualify as a top executive for any major oil company. Henry attended Fairleigh Dickinson University, where he majored in Business and Marketing. He later joined "Caltex" (Chevron and Texaco) in Holland in order to expand his marketing experience and for exposure in the foreign oil market, including its effects on the United States energy supply. After extensive experience in these areas, Henry in 1964, began his employment with Shotmeyer Petroleum. Henry is also extremely capable and knowledgeable in all areas of the petroleum industry and would be highly qualified as an executive with any major oil company. Shotmeyer Petroleum deducted as compensation to Mr. Shotmeyer, Charles and Henry, the following amounts in each of its taxable years ended December 31: *348 [SEE TABLE IN ORIGINAL] The amounts paid to Mr. Shotmeyer prior to 197o to Charles and Henry have not been challenged by respondent as being unreasonable. During its taxable years ended December 31, 1973 through December 31, 1975, inclusive, Shotmeyer Petroleum paid annual compensation to Mr. Shotmeyer as follows: 1973
1974
1975
Payments made
$ 17,225
$ 16,900
$ 16,900
Year end accrual
120,000
160,000
120,000
Mr. Shotmeyer, as sole shareholder and chief executive officer, could and did effectively set his own level of compensation.Corporate minutes of Shotmeyer Petroleum detail board of directors meetings allegedly dated November 28, 1972, March 27, 1974 and March 19, 1975, which set Mr. Shotmeyer's base level compensation to be at least $125,000, $130,000 and $135,000 for the calendar years 1973, 1974 and 1975, respectively.
During the years here in issue Mr. and Mrs. Shotmeyer stayed at a condominium owned by Shotmeyer Petroleum during the below indicated intervals: 1/1/73 through
3/6/73
3/7/73 through
4/10/73
4/12/73 through
4/20/73
6/18/73 through
6/27/73
6/30/73 through
7/11/73
7/14/73 through
8/6/73
8/13/73 through
9/18/73
11/15/73 through
12/3/73
12/6/73 through
4/10/74
12/10/74 through
3/18/75
*349 One of Mr. Shotmeyer's purposes in being in Florida during the above time periods was to investigate the potential for expansion of Shotmeyer Petroleum's business into the Florida market, in part at the encouragement and request of Mobil Oil Corp., one of Shotmeyer Petroleum's major suppliers and station lessees. During his trips to Florida, Mr. Shotmeyer specifically investigated the possible acquisition of the following businesses: (1) Fill-R-Up, a large petroleum marketing company; (2) Consumer's Gasoline, a company operating a number of service stations in Florida and the Southeast; and (3) other facilities and station locations. Throughout the entire time Mr. Shotmeyer was in Florida he maintained constant daily telephone contact with the new Jersey offices of Shotmeyer Petroleum and continued substantially to carry out his normal duties and tasks in connection with its business over the telephone. During the aforementioned Florida trips, Mr. Shotmeyer did not maintain a business office separate from his residence there, but rather worked out of his residence. During the years in issue when Mr. Shotmeyer was present in New Jersey, he worked full days at the offices *350 of Shotmeyer Petroleum from Monday through Friday, most Saturdays as well as some Sundays. His typical work day ran from 7:00 or 8:00 a.m. until around 3:00 to 5:00 p.m. Whether in Florida or in New Jersey Mr. Shotmeyer maintained his own office and secretary at the New Jersey offices of Shotmeyer Petroleum. As president and chief executive officer of Shotmeyer Petroleum, Mr. Shotmeyer's duties and tasks generally consisted of supervising and trouble-shooting the overall conduct of Shotmeyer Petroleum's business. His duties and tasks specifically included contacting product suppliers and arranging for supplies during a time of supply shortgages and allocations; negotiating supply contracts with Shotmeyer Petroleum's major suppliers; reviewing and conferring with company attorneys on petroleum supply regulations imposed by the Federal energy office and deciding on business strategy relevant thereto; evaluating and arranging for the acquisition, operation, and disposition of retail service station and other facilities integral to the business of Shotmeyer Petroleum; supervising the financial operations of Shotmeyer Petroleum; particularly with respect to accounts receivable and payable *351 and any inventory financing, negotiating and reviewing the rates and terms of Shotmeyer Petroleum's bank financing and endorsing notes executed in connection therewith; making personnel decisions with respect to senior and higher level employees of Shotmeyer Petroleum; attending meetings of board of directors of Shotmeyer Petroleum and there reviewing the company's past and anticipated future business course, and rendering ultimate decisions thereto; overseeing the entire operation of Shotmeyer Petroleum's business, selecting new business strategies, and generally keeping abreast of the problems affecting the business and guiding the company through them. As a result of Mr. Shotmeyer's efforts both prior to and during the years in issue Shotmeyer Petroleum enjoyed substantial growth and success. By 1973 through 1975 Shotmeyer Petroleum and Mr. Shotmeyer had acquired, owned, and leased to independent operators, some 70 or so retail service stations located in New Jersey, Pennsylvania, Delaware, Maryland and Virginia. Indicative of the business growth and success of Shotmeyer Petroleum are the increases in gasoline gallonages sold by it and its gross dollars sales figure for the *352 years in issue: Year
Gross Sales
Gallonages
1973
$ 4,643,970
13,000,000
1974
8,338,921
17,000,000
1975
11,008,473
20,000,000
However, Shotmeyer Petroleum has never declared a dividend with respect to its stock. A further indication of Mr. Shotmeyer's business skills and success is the growth of the business between 1925 and 1971. He started alone in 1925 with one service station which was 100 percent financed. Subsequently his brother Albert joined him in the service station business.Prior to their dividing up the assets in 1971 the Shotmeyer brothers at one time had as many as 200 service stations. In an effort to secure the growth and success of Shotmeyer Petroleum Mr. Shotmeyer and his then 50 percent co-shareholder brother, Albert, continued to reinvest the earnings of Shotmeyer Petroleum in the corporation. From its beginning in 1946 and up through the year 1972, Mr. Shotmeyer never drew a salary or received compensation for services from Shotmeyer Petroleum in an amount greater than some $15,600 annually. For example, in 1966, Shotmeyer Petroleum paid compensation to Mr. Shotmeyer of 12,000. At no time throughout his business career has *353 Mr. Shotmeyer been the beneficiary of any pension, profit sharing, stock option, or welfare plan established by Shotmeyer Petroleum. The business growth and success enjoyed by Shotmeyer Petroleum is largely attributable to the following factors: (a) the business acumen, ability, experience, and contacts of Mr. Shotmeyer; (b) the hard work, long hours, and efforts devoted by Mr. Shotmeyer to the business of Shotmeyer Petroleum and its predecessors; (c) the willingness of Mr. Shotmeyer and his brother, Albert, to cause Shotmeyer Petroleum to maximize the retention of its earnings for the purpose of financing the latter's business growth and expansion, including the carrying of ever-increasing petroleum product inventories and debt services; (d) the willingness of Mr. Shotmeyer and Albert to forego larger salaries, most fringe benefits, and dividend payments from Shotmeyer Petroleum, so that its retention of earnings could be maximized; and (e) the willingness of Mr. Shotmeyer to risk his personal credit to guarantee individual business credit and loans extended to Shotmeyer Petroleum. "Annual Statement Studies--1975 Edition," published by Robert Morris Associates, is a study of compensation *354 paid by businesses comparable to Shotmeyer Petroleum. Said study shows that petroleum products wholesalers of all sizes, during the years in review, paid an average of $152,000 annually in officers' salaries, such amount being an average of 1.9 percent of average net sales; and that petroleum product wholesalers approximating $10,000,000 in sales paid an average of $160,000 annually in officers salaries, such amount being an average of 1.6 percent of average net sales. OPINION The only issue presented is whether amounts paid to Mr. Shotmeyer during the years in issue constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1). The question is one of fact to be determined from all the facts and circumstances of the case. Charles Schneider & Co. v. Commissioner, 500 F.2d 148 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The burden of proving reasonableness is upon petitioner. Botany Worsted Mills v. United States, 278 U.S. 282 (1929); *355 The Barton-Gillet Co. v. Commissioner, 442 F.2d 1343 (4th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court; and when the case involves a closely held corporation where the controlling shareholders-executives set their own compensation as executives, the reasonableness of such compensation necessitates our close scrutiny in order to determine if the payment of such alleged compensation is not, in fact, a distribution of corporate profits. Miles-Conley Co. v. Commissioner, 173 F.2d 958, 960 (4th Cir. 1949), affg. 10 T.C. 754 (1948). As stated in Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court, the pertinent facts and circumstances to be considered in a case of this type are as follows: The employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries *356 with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * The situation must be considered as a whole with no single factor decisive.
Respondent argues on brief that the instant case is one of an individual who helped found a business, made major contributions to its growth and success, but during the years in issue had become semi-retired. In support of this contention, respondent maintains that Mr. Shotmeyer's corporate duties had been reduced and for the most part assumed by his sons. That Mr. Shotmeyer's being in Florida over 14 of the 36 months here in issue further evidences his diminished involvement with Shotmeyer Petroleum. Thus, respondent contends that Mr. Shotmeyer's day-to-day involvement in corporate affairs was minimal and that the compensation to him represents an attempt to deduct distributions of corporate profits to the corporation's sole shareholder. Alternatively, respondent contends *357 that regardless of whether Mr. Shotmeyer was employed full-time, the compensation paid during the years in issue is still unreasonably high. Both parties have submitted excellent briefs. On the facts here present resolution of the issue has been difficult. However, after careful review of the entire record, we hold that the amounts paid to Mr. Shotmeyer constituted reasonable compensation for services actually rendered within the ambit of section 162(a)(1).We have incorporated into our analysis, infra, the Mayson factors that we deem relevant to the facts and circumstances at hand. Respondent relied almost exclusively on Mr. Shotmeyer's trips to Florida to establish his lack of involvement in corporate affairs. In our findings of facts we found that the purpose of Mr. Shotmeyer's Florida trips was substantially for the benefit of Shotmeyer Petroleum. Furthermore, while in Florida, Mr. Shotmeyer remained in constant daily phone contact with the New Jersey offices of the corporation. When Mr. Shotmeyer was in New Jersey, he devoted almost his entire time to his work. Respondent concedes that Mr. Shotmeyer was responsible for senior employee relations, dealt to some *358 extent with the companies that supplied oil for the corporation, and that he was also involved with watching over the accounts receivable. In addition to these responsibilities Mr. Shotmeyer, as president of the corporation, made every major corporate decision. Respondent argues, and we agree, that the day-to-day operation of the business was managed by petitioners' sons. However, as we have indicated, Mr. Shotmeyer spent a substantial amount of time on corporate business. The amount of time spent by him is comparable, if not greater, than that spent by his two sons. It cannot be gainsaid that Mr. Shotmeyer was primarily responsible for the success of Shotmeyer Petroleum prior to and during the years here in issue. At the trial herein, Mr. Shotmeyer convinced this Court that he was the driving force and the decision maker. In short, he was the pipeline which insured the continual flow of Shotmeyer Petroleum. In addition to performing the above services Mr. Shotmeyer personally guaranteed business credit and loans to Shotmeyer Petroleum and serviced as its chief trouble-shooter. *359 A taxpayer's willingness to guarantee personally corporate debts should be considered in determining reasonable compensation. See R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 51 (1972). With respect to being the chief trouble-shooter Mr. Shotmeyer was responsible for securing Shotmeyer Petroleum's supply of oil and gas, public relations with service station operators and insuring the corporation's compliance with new Government regulations. The years in issue were troublesome years for petroleum distributors. Between 1973 and 1975 the Arab oil embargo occurred and a new Federal energy regulatory body was created which promulgated regulations allocating the supply of gasoline and fuel oil. Despite the uncertainties of these times, with Mr. Shotmeyer's contacts, business acumen and experience, Shotmeyer Petroleum not only secured its level of supply but increased gasoline gallonage sales from 13 to 20 million. Due to their relative inexperience we do not believe that the sons could have equaled this service to the company. Respondent contends that economic conditions were the reason for the increases in compensation and not the value of Mr. Shotmeyer's services. *360 Clearly the drastic reduction of inventory combined with the higher price of gasoline were major factors in creating the increased profits and liquidity necessary to pay the compensation. Mr. Shotmeyer stated the substantial increase in salary was due to the company's becoming "flush" and his belief that it was time he started reaping some of the benefits. [1] After a careful review of the record we are convinced that economic conditions were not the primary reason for the increase in salary. We note that prior to 1972 Mr. Shotmeyer never paid himself more than $16,000 a year. The primary reason for the lower salary was the corporation's need for capital to carry its large inventory and in furtherance of its expansion program.It cannot be denied that prior to the years in issue Mr. Shotmeyer was undercompensated. For this reason the substantial increase in salary does not support respondent's position and the prior compensation level is not indicative of a reasonable compensation for Mr. Shotmeyer. *361 The highest salary paid to either Charles of Henry during the taxable years in issue was $66,434, $97,160, and $99,260 for 1973, 1974 and 1975, respectively. Shotmeyer Petroleum's deduction of these amounts has not been contested. The workday for Mr. Shotmeyer was equal to that of his two sons. Like respondent we do not question the value of the sons' worth to the corporation. Further, we think it apparent that 1 hour of a chief executive's time, having over 45 years experience, is worth substantially more than the two sons' whose combined experience was approximately less than one-half that of Mr. Shotmeyer. See Levenson and Klein, Inc.,67 T.C. 694, 713 (1977). Taking the highest salary paid to either of the two sons and adding thereto the additional value to the corporation of Mr. Shotmeyer's experience, business acumen, contacts, securing corporate debts, high esteem among his peers in the industry, and his foregoing of either a pension or profit sharing plan and life insurance and his undercompensation in previous years, we find that Shotmeyer Petroleum properly characterized its payments to Mr. Shotmeyer as compensation. A study of salaries paid by *362 comparable businesses supports our conclusion with respect to the reasonableness of the compensation at issue. Admittedly we are disturbed by Shotmeyer Petroleum's historical failure to make a dividend distribution. If its stock were owned by an unrelated third party who had advanced capital, there would naturally come a time when that party would become restless over Shotmeyer Petroleum's failure to pay a return on his investment. We are not prepared to say that it had reached that point with respect to its taxable years here in issue, although we certainly do not predict what our reaction would be to a similar failure to pay dividends in the future. At some point enough is enough. [2]
To reflect concessions by both parties, Decisions will be entered under Rule 155. Footnotes
1. "And every nickel we made, we plowed back into the business. And we worked on very, very meager salaries, all my life, up until 1969, I was still making about $15,000. And I could live on $15,000, this is all right. Maybe a lot of people couldn't. And then in 1973, I was almost 70 years old, and the first time we got flush into the business, that we had--that money came in from different angles, because we stopped expanding, then I thought it was advisable for me to take a bigger salary, for the first time in my life then."↩
2. See Eduardo Catalano, Inc. v. Commissioner, T.C. Memo. 1979-183↩.