LEDFORD CONSTRUCTION CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ledford Constr. Co. v. Commissioner
Docket No. 7564-73.
United States Tax Court
T.C. Memo 1977-204; 1977 Tax Ct. Memo LEXIS 237; 36 T.C.M. (CCH) 858; T.C.M. (RIA) 770204; June 30, 1977, Filed *237 Compensation paid petitioner's founder and chief executive officer in 1969 and 1970 found to be payment for services rendered and reasonable in amount. William T. Sherwood, Jr., and Joseph Leo McGroary, for the petitioner. Harris J. Belinkie, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioner's corporate income taxes for the taxable years ending March 31, 1969, and March 31, 1970, of $17,001.59 and $20,616.54, respectively. Some of the adjustments giving rise to these deficiencies have been conceded by petitioner. The sole issue remaining to be decided is *238 whether under section 162(a)(1), I.R.C. 1954, [1]amounts paid by petitioner to Stanley B. Ledford, its president and treasurer, were reasonable compensation for personal services actually rendered. FINDINGS OF FACT Certain facts have been stipulated and are so found. Petitioner is a Maryland corporation with its principal place of business in Washington, D.C. It is engaged in the construction of electrical underground conduits for two major utility companies, the Potomac Electric Power Co. (hereafter PEPCO) and Chesapeake and Potomac Telephone Co. (hereafter C & P). Petitioner filed corporate income tax returns for the years in issue with the district director of internal revenue, Baltimore, Md. It is an an accrual-basis taxpayer with a taxable year ending March 31. Petitioner's stock was owned by Stanley B. Ledford (75 percent), his son (12-1/2 percent), and his daughter (12-1/2 percent). Stanley B. Ledford, after 1 year of high school, worked for a dairy in Tennessee until he was 23. Ledford then *239 went to Washington, D.C., where he worked for the Department of Agriculture and the Bureau of Entomology and Plant Quarantine for 2 years. He was laid off from that job in 1939 and worked for the Service Parking Corp. until he was drafted into the Army as a private in 1941. Ledford remained in the Army until October 30, 1945, when he was discharged with the rank of Captain. His army experience was primarily as company commander in the Corps of Engineers, mostly in construction. The largest army construction job in which he participated was when his company constructed Henderson Field on Guadalcanal. After leaving the Army, Ledford went to work for Circle Construction Co. as a compressor operator for $1.25 per hour. Ledford remained with Circle until April 1958, and by that time he was vice-president in charge of operations, earning a salary of $12,000 a year. When Ledford advised Circle he was leaving to form his own company, Circle offered him $25,000 a year salary plus a 10-percent stock interest in Circle. Ledford formed petitioner in 1958 and financed the business by refinancing his home to obtain $4,500 and borrowing $3,000 on his life insurance. He also arranged for *240 credit for purchases of material needed to perform conduit construction jobs and for a $2,500 line of credit. Ledford needed more bank financing as his business grew, and he has obtained financing based on not only the credit of Ledford Construction Co., but the personal credit of him and his wife, as are construction bonds. Ledford has exposed himself to personal liability in excess of $1 million in cosigning obligations of the company. During TYE March 31, 1969, and TYE March 31, 1970, Ledford was president and treasurer of petitioner and his duties included the final responsibility for selecting and pricing each job to be performed by petitioner, insuring that the work was adequately financed, assigning proper personnel to execute the jobs, handling all customer complaints, handling all union negotiations with four unions, handling all negotiations with public safety officials, supervising all capital investments and equipment purchases, and discharging the primary responsibility of running petitioner's business affairs. During TYE March 31, 1969, and TYE March 31, 1970, Ledford ususally worked from 6:00 to 6:30 a.m. until 5:00 to 6:00 p.m., Monday through Friday, and he *241 frequently worked on Saturdays and Sundays. He was not engaged in any other business during these years. Petitioner's business has grown and prospered under the leadership of Ledford. In TYE March 31, 1959, petitioner had 10 employees. In the TYE March 31, 1969, and TYE March 31, 1970, the number of employees was in excess of 250. In 1959 Ledford hired Clayton B. Donaldson as a crew chief or job supervisor. By TYE March 31, 1969, Donaldson had been promoted to vice-president and was responsible for petitioner's supervisors and foremen during the years in issue. Donaldson is a high-school graduate with no specialized training in engineering. He has had 40 years experience in construction. Donaldson became president of petitioner in 1973. In 1963 Ledford hired Andrew Hisler as a vice-president, after Hisler retired as superintendent of conduit construction at PEPCO. Hisler has a Bachelor of Science degree in civil engineering, is a registered engineer, and a member of various professional engineering societies. His duties with petitioner were as follows: Signing checks, supervising the building of petitioner's new office, keeping records for new equipment, assisting Ledford *242 in union negotiations, coordinating office work, and performing miscellaneous administrative duties. Hisler also served as a general consultant on engineering matters because of his engineering background and prior experience with PEPCO. R. N. Reed and J. E. Ponton functioned as division supervisors during the years in issue. Ponton was also assistant secretary of petitioner. Petitioner has never declared or paid dividends to its shareholders. It did not pay dividends in the TYE March 31, 1969, and TYE March 31, 1970, because it was still growing and needed additional capital. Salaries paid to Ledford and petitioner's taxable income for TYE March 31, 1959, through March 31, 1970, are set forth below: Year
Ledford
Taxable
3-31
salary
income
1959
$ --
$ ( 4,388)
1960
16,800
9,224
1961
15,006
17,596
1962
30,560
24,231
1963
30,894
8,094
1964
35,389
88,7 69
1965
31,547
91,605
1966
50,088
133,628
1967
60,640
124,680
1968
72,570
205,111
1969
82,200
276,485
1970
89,574
181,090
In 1970 Raymond International Inc., a large company listed on the New York Stock Exchange, approached Ledford and offered to buy petitioner. Raymond *243 International was interested in getting into utility construction work in the Washington area.In an hour-and-a-half meeting at the petitioner's office in Washington, attended by Ledford, his son, and his attorney on behalf of petitioner, and Joseph F. Barnett, manager of corporate planning and acquisitions of Raymond International, Inc., and S. E. Pekin, a business broker with the Madrid Corp., Miami, Fla., on behalf of Raymond International, the parties attempted to negotiate a deal. No sale was consummated because Ledford wanted $2 million cash for petitioner and Raymond offered only $1,250,000, part cash and part deferred, and stipulated that Ledford must agree to remain to manage the business for 5 years under a contract calling for a salary of $100,000 a year. Ledford has never recommended to the board of directors that petitioner pay him the full amount that he deems his services are worth because it was necessary to leave a substantial amount of cash in the company to keep it on a sound basis. The over-all policy Ledford recommended to the board of directors was to increase his salary quarterly according to petitioner's earning power and the board of directors authorized *244 his salaries in accordance with his recommendations in the TYE March 31, 1969, and TYE March 31, 1970. The A. J. Ellis Co. (hereafter Ellis Co.) has been in business since 1928. During the calendar years 1969 and 1970 the Ellis Co. performed basically the same work as petitioner in the D.C. area. During 1969 and 1970, the officers of Ellis Co. and their respective duties were as follows: a. A. James Ellis - president (since 1956). Ellis' duties consisted of the following: General supervision of employees, final pricing of jobs, assisting the estimators, employee relations, financial relations, union contracts, labor grievances, and other general supervisory tasks. Ellis is a graduate of West Point and has an engineering degree. b. Ellis Co. also had a vice-president and general manager, who is a CPA and supervises the office; two vice-presidents who are general supervisors and engineer-estimators; and a secretary-office manager. B. Frank Joy Co., Inc. (hereafter Joy Co.) has been in business since 1917. During the calendar years 1969 and 1970, 70 percent of the Joy Co. work was the same as that performed by petitioner in the D.C. area. The president of Joy Co. is *245 Lee Joy. Joy is a high-school graduate and has been working for the company for the past 30 years (as president since 1955). Joy's duties consist of the following: To check and supervise employees in the conduct of their work; to inspect the various job sites; to deal with employee relations; to submit bids on various jobs; to approve all purchases of equipment; to work with Joy's treasurer on financial matters; and to obtain financing for Joy. The other officers of the Joy Co. consist of a secretary-treasurer and a vice-president. The secretary-treasurer does most of the day-to-day financing and supervises the shop foreman and the fleet of equipment. The vice-president does day-to-day supervisory work and concentrates on the C & P jobs. W. F. Wilson and Sons, Inc. (hereafter Wilson Co.), performed some work similar to that of petitioner in the calendar years 1969 and 1970 in the Baltimore and Washington areas. During 1969 and 1970 L. D. Wilson was president of the company. He supervised the bidding of jobs, purchasing of equipment, inspected job sites on a daily basis, supervised hiring and employee relations, and had the general over-all responsibility for company management. *246 Wilson has worked for Wilson Co. for the past 30 years. Wilson Co. also had a secretary-treasurer who supervised the office management, arranged for loans, handled personnel problems, and inspected jobs; a vice-president responsible for equipment maintenance and purchasing; a vice-president in charge of the estimating department; and a vice-president in charge of equipment. Comparative data for petitioner, Wilson Co., Joy Co., and Ellis Co. is as follows (figures are rounded to the nearest hundred): Taxable income
before
President's
Gross receipts
President's salary
salary
Corporation
1969
1970
1969
1970
1969
Ledford
$2,960,200
$3,113,800
$358,700
$270,700
$82,200
Wilson
4,812,000
5,874,300
300,800
102,200
59,300
Joy
4,097,500
4,478,1 00
174,900
137,100
44,000
Ellis
2,377,000
2,563,300
124,200
134,700
59,400
Taxable
salary
income
Corporation
1970
1969
1970
Ledford
$89,600
$276,500
$181,100
Wilson
61,800
241,500
40,400
Joy
46,800
130,900
90,300
Ellis
61,400
64,800
73,300
Following are the comparative officers' salaries for these companies: *247 Ledford
1969
1970
S. B. Ledford, Pres.-Treas.
$82,200
$89,574
M. L. Ledford, Secy.
10,440
11,460
C. B. Donaldson, Vice-Pres.
21,825
40,180
A. L. Hisler, Vice-Pres.
36,600
20,045
J. E. Ponton, Asst. Secy.
20,560
19,680
$171,625
$180,939
Wilson
L. D. Wilson, Pres.
$ 59,270
$ 61,780
E. C. Wilson, Secy.-Treas.
58,312
60,730
J. F. Wilson, Vice-Pres.
38,860
38,804
H. E. Hays, Vice-Pres.
54,355
56,524
W. Cuff, Vice-Pres.
--
27,204
$210,797
$245,042
Joy
L. Joy, Pres.
$ 44,000
$ 46,750
G. Y. McCully, Secy.-Treas.
39,350
41,090
E. M. Groves, Vice-Pres.
35,690
37,780
$119,040
$125,620
Ellis
A. J. Ellis, Pres.
$ 59,355
$ 61,440
J. Ellis, Vice-Pres.
44,200
58,000
Defato, Vice-Pres.
26,550
29,450
P. Julian
--
29,450
M. Platt
--
17,750
$130,105
$196,090
Comparative profit-sharing (for Wilson pension and profit-sharing) contributions for the officers of these companies were as follows: Ledford
1969
1970
S. B. Ledford, Pres.-Treas.
No plan
$ 7,104
M. L. Ledford, Secy.
No plan
912
C. B. Donaldson, Vice-pres.
No plan
3,187
A. L. Hisler, Vice-pres.
No plan
1,586
J. E. Ponton, Asst. Secy.
No plan
1,562
$14,351
Wilson
L. D. Wilson, Pres.
$ 4,800
$ 2,400
E. C. Wilson, Secy.-Treas.
4,600
2,400
J. F. Wilson, Vice-pres.
3,200
1,600
H. E. Hays, Vice-pres.
4,280
2,200
W. Cuff, Vice-pres.
--
1,600
$16,880
$10,200
Joy
L. Joy, Pres.
$ 2,100
$ 1,276
G. Y. McCully, Secy.-Treas.
2,048
1,248
E. M. Groves, Vice-pres.
1,879
1,160
$ 6,027
$ 3,684
Ellis
A. J. Ellis, Pres.
$ 4,057
$ 4,813
J. Ellis, Vice-pres.
3,683
4,780
Defato, Vice-pres.
2,006
2,205
P. Julian
--
2,125
M. Platt
--
1,313
$ 9,746
$15,236
*248 In addition to his salaries of $82,200 and $89,574 for TYE March 31, 1969, and TYE March 31, 1970, respectively, Stanley B. Ledford received these fringe benefits: (a) A profit-sharing contribution for TYE March 31, 1970, of $7,103.91, (b) a major medical policy for Ledford and his family, (c) premiums for a $15,000 life insurance policy on Ledford's life with his wife as beneficiary, (d) an automobile, and (e) dues for a membership at Atlantic Country Club. Petitioner's profit-sharing plan has been approved by the Internal Revenue Service, and petitioner pays for medical insurance for all of its employees, directly or indirectly. The compensation in dispute was as follows: TYE
TYE
3-31-69
3-31-70
1. Nondeferred compensation
a. Claimed
$82,200.00
$89,574.00
b. Allowed
50,000.00
53,000.00
c. Disallowed
32,200.00
36,574.00
2. Profit-sharing
contribution - disallowed
--
2,915.33
3. Net disallowance
$32,200.00
$39,489.33
As of the date of trial, Stanley B. Ledford was chairman of the board and treasurer of petitioner, and Clayton B. Donaldson was vice-chairman of the board. ULTIMATE FINDING OF FACT The salary and other emoluments *249 paid Stanley B. Ledford in TYE March 31, 1969, and TYE March 31, 1970, were for services rendered and were reasonable in amount. [2]
OPINION Petitioner Ledford Construction Co. paid Stanley B. Ledford, its president and treasurer, a salary of $82,200 for TYE March 31, 1969, and $89,574 for TYE March 31, 1970. For the 1970 fiscal year, it also made a profitsharing contribution for Ledford of $7,103.91. These amounts were deducted by petitioner as compensation for services rendered. Respondent determined that the compensation paid by petitioner to Ledford was excessive and disallowed deductions claimed for salary to the extent they exceeded $50,000 for 1969 and $53,000 for 1970, and disallowed $2,915.33 of the contribution to the profit-sharing plan in 1970. Respondent's determination carries with it a presumption of correctness, and petitioner bears the burden of proving it is entitled to the deductions claimed. Botany Worsted Mills v. United States,278 U.S. 282 (1929). *250 Section 162(a)(1) allows a deduction for ordinary and necessary business expenses including a reasonable allowance for salaries or other compensation for personal services actually rendered. Pursuant to section 1.162-7(a), Income Tax Regs., the test of deductibility for compensation payments is whether they are reasonable and are in fact payments purely for services. The regulations warn that one reason for disallowing excessive compensation is when it is paid to employee-stockholders as a guise for the distribution of profits to stockholders and not as an operating expense of the business: If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * * [ *251 Sec. 1.162-7(b)(1), Income Tax Regs.] The regulations properly caution that reasonableness of salary is subject to close scrutiny when paid to employee-stockholders; and that the failure of a closely held corporation to pay dividends is a signal for even closer scrutiny of whether the salaries paid to employee-stockholders is in reality compensation for services or a distribution of profits. However, under section 162(a)(1) the issue is whether the compensation is reasonable; it is not a provision for dealing with an unreasonable accumulation of earnings and profits. [3] Thus, if the compensation is reasonable, whether dividends were paid is immaterial. One of the most important factors in determining the reasonableness of compensation is the amount paid to similar employees by comparable employers. Or, as the regulations put it: "It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Sec. 1.162-7(b)(3), Income Tax Regs. *252 Reasonableness of compensation is, of course, a question of fact, and the employee's qualifications and other factors also should be considered. For a list of factors, see Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115, 119 (6th Cir. 1949). Petitioner's growth since its inception in 1959 to taxable income of $276,485 in 1969 and $181,090 in 1970 are convincing evidence that Stanley B. Ledford was a qualified construction executive. The testimony of Ledford and other officers of petitioner (Donaldson and Hisler) establishes that Ledford was largely responsible for the success of the business. He formed the company, arranged financing, employed and trained personnel, handled bids, conducted union negotiations, dealt with public officials and had final responsibility for petitioner's affairs. Ledford clearly provided valuable services to the corporation for the years in issue. How valuable these services were is evidenced by the offer of employment Ledford *253 received in connection with an offer to purchase the business in 1970. A large company listed on the New York Stock Exchange attempted to purchase petitioner Ledford Construction Co. for $1,250,000, and offered Ledford a 5-year contract at $100,000 a year to run the business for them. It may be difficult to separate the employment offer from the purchase offer, but the job offer nonetheless supports the reasonableness of the compensation paid Ledford by petitioner. In determining the reasonableness of Ledford's compensation we believe we should also give some consideration to the personal liability Ledford became exposed to when cosigning obligations of the company, which have at times exceeded $1 million. Comparing Ledford's salary and performance with that of the presidents of three similar companies pointed to by respondent (Wilson, Ellis, and Joy) only convinces us that Ledford's compensation was reasonable. The comparative figures are set out in the findings of fact. Furthermore, unlike his counterparts in those companies, Ledford formed petitioner himself and is almost entirely responsible for its phenomenal growth during the period 1959 through 1970. Respondent *254 relies on comparative gross receipts and salaries and argues petitioner's gross receipts do not warrant the higher compensation paid Ledford. We interpret these figures, however, to mean Ledford outperformed the presidents of the three other companies. Petitioner's taxable income before president's salaries amounted to $629,400 for 1969-1970 compared to $403,000 for Wilson Co., $312,000 for Joy Co., and $258,900 for Ellis Co. Its taxable income for the period in issue was $457,600 compared to $281,900 for Wilson Co., $221,200 for Joy Co., and $138,100 for Ellis Co. These figures provide a better measure of profitability than gross receipts and are persuasive evidence that Ledford should have been the highest paid president of the group during 1969-1970. [4]Ledford's salary in relation to petitioner's taxable income and comparative figures are as follows: 1969
1970
S. B. Ledford
$82,200/$276,485
(29.73%)
$89,574/181,090
(49.46%)
L. D. Wilson
59,270/241,519
(24.54%)
61,780/40,414
(152.87%)
L. Joy
43,999/130,917
(33.61%)
46,750/90,268
(51.79%)
A. J. Ellis
59,355/64,818
(91.57%)
61,440/73,304
(83.82%)
Because of Ledford's superior *255 performance, respondent failed to show the lower salaries paid the other presidents were, in the language of the regulations, "under like circumstances." Moreover, A. James Ellis and Lee Joy testified upon cross-examination that they would have paid Stanley B. Ledford $100,000 a year if he were to have come to them and indicated he could bring in the gross income and taxable income Ledford Construction Co. earned in 1969 and 1970. In our opinion, petitioner met its burden of proving the reasonableness of Ledford's salaries. We have been presented with no meaningful basis for comparing Stanley B. Ledford's fringe benefits (profitsharing contribution, medical and life insurance premiums, automobile, and country club dues) with those of the presidents of Wilson Co., Joy Co., or Ellis Co. The only comparative data in the record is with respect to profitsharing contributions, but there is no indication of how these amounts were determined. Presumably, Ledford's profit-sharing contributions were higher at least in part because of petitioner's higher earnings. In any event, based on the entire record, we believe Ledford's fringe benefits, along with his salary, were reasonable in amount. *256 There is nothing in the record to suggest that a part of the compensation paid Ledford was a disguised distribution of profits. To the contrary, it appears that petitioner's policy was to pay Ledford compensation for the value of his services to petitioner limited by the amount petitioner could afford to pay in light of its fiscal requirements. The compensation of some of the other officers of petitioner who were not stockholders was determined in the same manner. In conclusion, petitioner met its burden of proving it was entitled to the deductions for Ledford's compensation in 1969 and 1970 as claimed. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise specified.↩
2. We have given no consideration to Exhibits 14-N to 16-P, the admissibility of which respondent questioned, in reaching this conclusion.↩
3. Ledford testified that petitioner had paid no dividends because of its need to increase its capital.↩
4. In Bellamy Ice Cream Co. v. Commissioner [Dec. 12,487-B], a Memorandum Opinion of this Court dated March 30, 1942, it was noted that "[t]he success of a business is usually measured by its net income rather than its gross, and the value to a corporation of the services of its officers is usually measured by the same yardstick."
Whether differences in the taxable income of petitioner and the other companies are attributable to nonrecurring items, accounting methods, or other circumstance that might offset the comparability of the taxable incomes is not disclosed in the record.↩