CENTEL COMMUNICATIONS COMPANY, Successor in interest to Fisk Telephone Systems, Inc., Successor in interest to Fisk Telephone Systems, Inc. and Subsidiaries, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 89–3650.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1990.

Decided Dec. 17, 1990.

Ethel R. Kaplan, McDermott, Will & Emery, Michael M. Conway, David B. Goroff, Frederic L. Hahn, Jay H. Zimbler, George R. Goodman, Hopkins & Sutter, Chicago, Ill., for petitioner-appellant.

Peter K. Scott, I.R.S., Richard Farber, Gary R. Allen, Steven Parks, Dept. of Justice, Tax Div., Appellate Section, Charles S. Casazza, U.S. Tax Court, Washington, D.C., for respondent-appellee.

Before CUMMINGS, CUDAHY and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

The Tax Court held that Centel Communications Company ("Centel") was not entitled to deduct on its 1980 return the value of stock warrants issued to three of its stockholders in 1978 and exercised by them in 1980. At the same time, the Tax Court held that the three stockholders had no additional income when they exercised their warrants in 1980. We affirm.

## I. BACKGROUND

Fisk Telephone Systems ("Fisk"), the predecessor of Centel, was formed by Lloyd K. Davis, Rex B. Grey and Fisk Electric Co. ("Electric") in 1971 to engage in the business of selling, leasing and maintaining private and commercial phone systems. In September 1973 Davis, Grey and Electric owned 47% of Fisk's common stock.

During its early years, Fisk showed net losses. It obtained a series of bank loans to carry on its essential operations. Davis and Grey personally guaranteed these loans, and Electric also guaranteed loan repayment by executing indemnification and subordination agreements in favor of the lender. Davis, Grey and Electric provided the guarantees to ensure the survival of Fisk and protect their investments in the company. Fisk's business began improving in 1974, and in 1975 the company

showed a profit for the first time. In May of 1978, in recognition of the risks assumed by Davis, Grey and Electric, Fisk granted them warrants authorizing each to purchase 50,000 additional shares of Fisk at $1 per share. The warrants were restricted in that they could only be exercised at specified times prior to May 1, 1982. The three stockholders exercised their warrants in February 1980, just one month before Centel acquired Fisk in a tax-free reorganization. In the reorganization Davis, Grey and Electric traded in the 150,000 shares they had acquired upon exercising their warrants. They received Centel stock worth $1,860,000 more than they had paid for the 150,000 shares in Fisk. At the same time Centel agreed to release Davis, Grey and Electric from their obligations under the guarantees.

In its 1980 tax return Centel claimed a tax deduction in the amount of approximately $1,860,000, pursuant to Section 83(h) of the Internal Revenue Code.[1] That section allows a deduction for the transfer of property made "in connection with the performance of services." The $1,860,000 figure represented the value of the warrants at the time they were exercised in 1980. However, Davis, Grey and Electric each had reported only $35,000 income in 1978, the figure representing the appraised value of the warrants at the time of issue.

To avoid being "whipsawed"[2] by the inconsistent positions taken by Centel and the three stockholders in question, the Commissioner of Internal Revenue deliberately made inconsistent deficiency determinations with respect to the parties. He determined in his notice of deficiency to Centel that Section 83 did not apply to the transfer of the warrants because they were not transferred "in connection with the performance of services." The warrants, in his opinion, were to be treated as construc-

tive dividends to Davis, Grey and Electric and as non-deductible distributions by Centel. Therefore he disallowed in full the deduction Centel had claimed under Section 83(h) in its 1980 tax return.

On the other hand, in the notices of deficiency issued to Davis, Grey and Electric, the Commissioner took the position that Section 83 did apply to the warrant transaction because the warrants were transferred "in connection with the performance of services." The Treasury Regulations promulgated under Section 83 direct that options without a "readily ascertainable" fair market value at the time of issuance be taxed only when the option is exercised. Treas. Reg. § 1.83–7 (1978). In this case the Commissioner believed that the value of the options was not readily ascertainable on the date of issuance. Thus under Section 83 he asserted that the three stockholders received taxable income upon exercise of the Fisk warrants in 1980 in the amount of $621,200 each.[3] Centel was entitled to a corresponding deduction in that same year.

As a result of the Commissioner's intentionally inconsistent positions, Centel, Davis, Grey and Electric all petitioned the Tax Court for a redetermination of their asserted deficiencies. The Tax Court consolidated the cases in view of the "whipsaw" situation presented.

Before the Tax Court, Centel asserted that Section 83 governed the tax consequences of the warrant transaction, that the warrants did not have a readily ascertainable value in 1978, and that under Section 83(h) it was entitled to deduct in 1980 the value of the warrants when they were exercised that year.

To the contrary, Davis, Grey and Electric argued that Section 83 was not applicable to the warrants because they were not received in connection with the performance of services within the meaning of Section 83. They thought the warrants were

---

**1.** All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

**2.** The Internal Revenue Service is "whipsawed" when taxpayers on either side of the same transaction treat that transaction differently so as to minimize the amount of taxes that each pays. In whipsaw cases the Commissioner is primari-

ly concerned to have the transaction treated consistently and to collect additional tax from one taxpayer or the other.

**3.** The Commissioner claimed that $621,000 was the value of the Fisk stock each stockholder received less the option price of the stock.

more aptly characterized as dividends because they were given to company stockholders. Davis, Grey and Electric also argued that the warrants were properly taxed in 1978 because the value of the warrants was apparent at that time. At trial, the Commissioner introduced expert testimony to establish that the warrants did not have a readily ascertainable value in 1978, while Davis, Grey and Electric introduced contrary testimony.

The Tax Court excused the Commissioner from filing an opening brief, reasoning that the Commissioner's role in the litigation was essentially that of a stakeholder who wished only to obtain consistent tax treatment of the transaction. The Commissioner did file a post-trial brief. In it he stated that Section 83 did not apply to the transaction because the guarantees the stockholders supplied were not the performance of a service within the meaning of Section 83.

Though the Commissioner in his post-trial brief agreed with the stockholders that Section 83 did not apply to the transaction, he did not recommend that the stockholders prevail. For the first time the Commissioner argued that, under the "open transaction" doctrine, which applies to options not granted in return for services, any treatment of the income and deductions should have been deferred to 1980 even if Section 83 did not apply. The "open transaction" doctrine was enunciated in *Burnet v. Logan*, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931). Under the doctrine, taxpayers report income and deductions attributable to warrants without an "ascertainable" value only upon exercise of the warrants. The evidence at trial, in the Commissioner's opinion, established that the warrants' value was not ascertainable in 1978. Thus the taxpayers properly should have reported their income and deductions in 1980 when the stockholders exercised their warrants and the warrants' value was apparent.

Davis, Grey and Electric moved to strike the Commissioner's new argument about the applicability of the "open transaction"

doctrine. They pointed out that the trial had focussed solely on Section 83 issues and contended that the late introduction of the "open transaction" theory prejudiced their case. Centel naturally supported the Commissioner's position and opposed the motion to strike.

The Tax Court granted the stockholders' motion and struck the portions of the Commissioner's brief devoted to the "open transaction" doctrine. The issue was stricken with respect both to the stockholders and Centel. On the merits, the court held that Section 83 did not apply to the warrant transaction. The court reasoned that Davis, Grey and Electric had executed guarantees in Fisk's favor to protect their own investments and not to perform services for the company. Fisk's grant of warrants to the stockholders thus was not "in connection with" any performance of services. In these circumstances, the stockholders had properly declared income in 1978 and earned no additional income in 1980. Centel's 1980 deduction was disallowed.

The Tax Court also considered and rejected Centel's alternative argument that its 1980 deduction was proper under Treasury Regulations § 1.61–15. The Tax Court held that the regulation, like Section 83, only applied to transactions involving the performance of services.

We agree with the Tax Court that neither Section 83 nor Treasury Regulations § 1.61–15 is applicable to the warrant transaction at issue in this case. We also hold that the Tax Court did not abuse its discretion in refusing to consider the "open transaction" argument advanced by the Commissioner in his post-trial brief. We therefore affirm its judgment against Centel.[4]

## II. ANALYSIS

*A. The Tax Court's Refusal to Consider the Applicability of the "Open Transaction" Doctrine.*

■ Centel argues vigorously that the Tax Court was obligated to accept the Com-

4. The Commissioner has moved to dismiss protective appeals he filed in the Fifth Circuit against Davis, Grey and Electric, the winners in the Tax Court, and now argues solely in favor of Centel's liability.

missioner's "open transaction" analysis and approve Centel's 1980 deduction on that basis. Centel construes the statements made in the Commissioner's post-trial brief as admissions and contends that the Tax Court abused its discretion by striking the portions of the brief favorable to Centel.

The Commissioner did recommend that Centel prevail in a portion of his brief. Though neither party had argued that the doctrine was relevant, the Commissioner maintained that "The test to apply * * * is the ascertainable fair market value test of *Burnet v. Logan.*" Commissioner's Post–Trial Brief at 43. On the question of whether the fair market value of the warrants was "ascertainable," the Commissioner wrote:

> [T]he respondent [Commissioner] concludes that based upon the evidence presented in this case, *i.e.*, the expert testimony, the warrants were not shown to have had an ascertainable fair market value when Telephone granted them on May 1, 1978. Accordingly, respondent concludes that 1980, the year of exercise, is the appropriate year for which Telephone should claim the value as an expense deduction and is the appropriate year for which Davis, Grey, and Electric should report the value as income. *Id.* at 19.

The Commissioner advised application of the "open transaction" doctrine and stated that 1980 was the appropriate year for tax treatment.

In its brief to this Court, Centel repeatedly characterizes the Commissioner's arguments as stipulations of fact or judicial admissions. It cites numerous cases which hold that a court must honor agreements between the litigants or admissions made by one party even if doing so disposes of the case. Centel believes that it was entitled to prevail on the basis of the Commissioner's concessions.[5] In arguing that the

Commissioner's statements were concessions, Centel loses sight of the context in which the statements were made and the role the Commissioner played in this litigation. The Commissioner's statements were not admissions or stipulations, and the law cited by Centel is inapposite for that reason.

The Commissioner's role in the litigation before the Tax Court was essentially that of a disinterested stakeholder. The Commissioner's primary concern in a "whipsaw" situation is having the parties to a transaction treat it consistently so as to ensure that taxpayers do not wrongfully deprive the Treasury of revenue. The Commissioner can advance arguments against each party without worrying that his arguments, taken collectively, are inconsistent. See, *e.g., Dixie Finance Co. v. United States,* 474 F.2d 501 (5th Cir.1973); *Estate of Goodall v. Commissioner,* 391 F.2d 775 (8th Cir.1968), certiorari denied, *Good–All Electric Mfg. Co. v. Commissioner,* 393 U.S. 829, 89 S.Ct. 96, 21 L.Ed.2d 100. It is accepted practice for the Commissioner to propose his best arguments against each taxpayer in an effort to collect additional taxes from one. To put it colloquially, he can "play both ends against the middle." *Better Beverages, Inc. v. United States,* 619 F.2d 424, 426 n. 3 (5th Cir.1980).

At some point in the litigation, the Commissioner can be expected to express the outcome that he would prefer. As was noted in *Better Beverages,* a case involving the proper tax treatment of proceeds from the sale of a business:

> IRS ordinarily will eventually choose to side with either the buyer or seller. It has done this here, as well, essentially championing the position of the seller * * * against that of the purchaser, while nominally reserving its rights

---

5. In Centel's view, the Commissioner also conceded that the warrants had no "readily ascertainable" value. This "concession" is relevant only if Section 83 applies to the warrant transaction. See discussion *supra* at 3. Because we affirm the Tax Court's holding that the warrant transaction does not fall within the ambit of Section 83, the Commissioner's statements regarding the "readily ascertainable" value of the warrants do not aid Centel. Furthermore, for the reasons that follow, we believe it inappropriate to view the Commissioner's statements as admissions or concessions.

against the [sellers] should this court decide in favor of Better Beverages. *Id.* The Commissioner's preference is, of course, not binding on the Tax Court. The court may accept or reject the IRS view. If the court ultimately upholds the Commissioner's preference, that position is binding on the Commissioner with respect to the other party to the transaction.

In this case, the Commissioner's statements expressed, like the statements made in *Better Beverages,* a provisional position. One of the theories advanced by the Commissioner in his post-trial brief was that Centel should properly have claimed its deduction in 1980 under the "open transaction" theory. Recognizing that the Tax Court might disagree with his preferred result, however, the Commissioner offered two alternative outcomes in his brief. If the court were to hold that Section 83 was applicable, rejecting the Commissioner's "open transaction" argument, the Commissioner recommended that the court proceed to the question of whether the value of the warrants was "readily ascertainable." Commissioner's Post–Trial Brief at 21. If the court were to hold that the warrant issuance was a dividend distribution rather than a transfer in connection with services, the correct result would be to deny Centel's deduction. *Id.* at 20.

Because the Commissioner's statements were arguments and not concessions, the Tax Court was under no obligation to credit them and render judgment for Centel. The Commissioner's presentation of three different theories did not concede the correctness of any. The Commissioner left to the Tax Court the question of the proper treatment of the warrant transaction.

■ Given the manner in which the Commissioner advanced his "open transaction" argument, it also was well within the Tax Court's discretion to strike the related portions of the Commissioner's brief. The stockholders moved to strike the Commissioner's argument on the ground that they were unfairly prejudiced by the late introduction of the "open transaction" issue. The Tax Court "consistently has refused to consider issues first raised in the parties'

post-trial brief when surprise and prejudice are found to exist." *Seligman v. Commissioner,* 84 T.C. 191, 198 (1985), affirmed on other grounds, 796 F.2d 116 (5th Cir.1986). On review, this Court will not overturn the Tax Court's decision not to consider issues raised after trial unless the Tax Court abused its discretion. *Knowlton v. Commissioner,* 791 F.2d 1506, 1511 (11th Cir. 1986). In this case, the only issue briefed and tried by any of the parties had been the applicability of Section 83. Because the Commissioner raised the "open transaction" argument only in his post-trial brief, the stockholders had no opportunity to argue the issue on brief or present relevant evidence. The Tax Court did not abuse its discretion in finding that the stockholders did not receive fair warning of the "open transaction" argument.

■ Nor did the Tax Court err in striking the "open transaction" argument as to Centel, once it struck it as to the stockholders. Centel argues that, regardless of the effects of the new argument on the stockholders, the Commissioner's concession on the "open transaction" issue made further adjudication of its own deficiency notice unnecessary. Centel claims that at the moment the Commissioner conceded the applicability of the "open transaction" doctrine, he lost his case against Centel.

Centel's position amounts to an assertion that the Commissioner is forever bound by any argument he makes to the Tax Court at the time he makes the argument, even if the court later rejects the Commissioner's argument. Such an approach is untenable, because it would prevent the Commissioner from protecting the Treasury in a "whipsaw" situation. A consideration of this case reveals the flaw in Centel's argument. Centel believes that the Commissioner conceded his case against Centel merely by proposing the applicability of the "open transaction" doctrine. The Tax Court, however, would still have been obliged to consider the applicability of the doctrine to the stockholders' case, assuming that the issue had been raised in such a way that it did not prejudice the stockholders. If the court had sided with the stockholders in

their suit, the IRS would have been "whipsawed." It could not have relied upon the judgment in favor of the stockholders to prevail against Centel. The Treasury would have been unable to collect additional taxes from either party.

Finally, Centel argues that the Tax Court should have raised the "open transaction" doctrine *sua sponte*, even if it decided that the Commissioner improperly raised the issue. This is the same argument that the court abused its discretion in declining to consider the "open transaction" doctrine, albeit in a different guise. We reiterate that the Tax Court was not obligated to consider or credit arguments introduced so late as to prejudice parties to the case. Also, Centel's indictment of the Tax Court for "entirely ignor[ing] the applicable case law" (Br. 48) is surprising since Centel itself never argued before or during trial that the "open transaction" doctrine had any relevance to the case.

*B. The Applicability of Section 83 of the Internal Revenue Code to the Centel Warrants.*

■ Having determined that the Tax Court did not abuse its discretion in declining to consider the "open transaction" doctrine, we are left to review the holdings of the Tax Court on the issues that were actually tried, the applicability of Section 83 and Treasury Regulations § 1.61–15 to the issuance of the warrants.

Centel argues that Section 83 of the Internal Revenue Code dictates the proper tax treatment of the income and deduction attributable to the warrants. Section 83(a), in pertinent part, provides:

(a) General Rule.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property * * *, over

(2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services * * *.

IRC § 83(a). Section 83(h), entitled "Deduction by Employer," allows a deduction to the person transferring the property in an amount equal to the gross income reported by the taxpayer performing the services. IRC § 83(h). Centel properly could take a deduction of $1,860,000 in 1980 if Fisk transferred warrants to Davis, Grey and Electric "in connection with the performance of services."

The Tax Court's decision on the applicability of Section 83 to the Centel transaction is entitled to deference. The issue of whether a transfer is made in connection with the performance of services is essentially a question of fact. *Bagley v. Commissioner*, 85 T.C. 663, 669 (1985), affirmed, 806 F.2d 169 (8th Cir.1986). That being so, the Tax Court's decision will not be overturned unless it is clearly erroneous.[6] *Commissioner v. Hendrickson*, 873 F.2d 1018 (7th Cir.1989); *Busch v. Commissioner*, 728 F.2d 945 (7th Cir.1984).

After reviewing the evidence presented by the parties, the Tax Court concluded

---

**6.** Centel makes a complicated argument for applying a *de novo* standard of review. Centel contends that the Tax Court analyzed the applicability of Section 83 to the warrants in two parts. According to Centel, the Tax Court first found that the warrants were given "in connection with" the guarantees. This, Centel concedes, was a factual inquiry, in that it required "determining the causal relationship between two actions" (Br. 29, n. 12). Centel distinguishes this inquiry from a second question of whether the giving of guarantees constituted "the performance of services." Centel believes that the Tax Court saw this issue as a legal one, and thus argues that this Court should review the conclusion of the Tax Court *de novo*.

Centel is mistaken when it claims that the Tax Court saw distinct legal and factual issues in this case. The Tax Court introduced its discussion by stating unequivocally that the single question presented, "whether property is transferred in connection with the performance of services," *Centel Communications Co. v. Commissioner*, 92 T.C. 612, 629 (1989), was one of fact. Later in its opinion, the Tax Court reiterated that it was making "a factual determination of whether Davis, Grey, and Electric received the warrants in connection with the performance of services under Section 83." *Id.* at 636. We agree with the Tax Court that the single issue presented is one of fact and thus proceed to review the Tax Court decision under the clearly erroneous standard.

that Davis, Grey and Electric did not perform "services" to Fisk by guaranteeing Fisk's loans. Consequently, the warrants granted to the three stockholders were not issued "in connection with" the performance of services and could not qualify for treatment under Section 83. The Tax Court carefully examined the legislative history of Section 83 and the relevant case law in order to determine what is meant by "service" in Section 83. It concluded from those sources that "service" usually connotes an act performed by an employee or independent contractor for the employer rather than aid lent to the company by a stockholder. The Tax Court found that Davis, Grey and Electric, by offering guarantees to their company, assumed additional financial risk in their role as stockholders. In giving the guarantees, the three stockholders were making additional contributions to capital in a self-serving effort to protect their substantial stock investment in Fisk, Centel's predecessor. They were not employees or independent contractors laboring or performing "services" for Fisk.

The legislative history of Section 83 supports the employee/shareholder distinction drawn by the Tax Court. The purpose of Section 83 was limited to setting comprehensive rules for the tax treatment of deferred compensation arrangements made between employers and employees. In particular the section aimed to eliminate the preferential tax treatment of restricted stock options received as compensation. S.Rep. No. 91–552, 91st Cong., 2d Sess. 120–1, reprinted in 1969 U.S.Code Cong. & Ad.News 2027, 2150–2151. Prior to 1969, an employee receiving restricted stock could defer declaring income until the restrictions lapsed. Also, the amount taxed as ordinary income was limited to the difference between the purchase price and the lesser of the fair market value at the time of acquisition or lapse of the restrictions. An employee who received stock options thus could both avoid and defer taxes, although employees receiving other benefits (such as contributions to a pension or profit-sharing trust) were taxed in full immediately at the time the employer made the contribution. H.Rep. No. 91–413 (Pt. 1),

91st Cong., 1st Sess. 86, reprinted in 1969 U.S.Code Cong. & Ad.News 1645, 1733–1734; *Cohn v. Commissioner*, 73 T.C. 443, 446 (1979); *Alves v. Commissioner*, 734 F.2d 478, 480–481 (9th Cir.1984). Section 83 eliminated this disparity in tax treatment by requiring the employee either to include the "excess" of the fair market value over the purchase price in his or her income at the time of acquisition, or to pay tax upon the full amount of appreciation when the restrictions expire or the stock is sold.

The transfer of warrants to stockholders Davis, Grey and Electric in return for their guarantee of Fisk's corporate indebtedness simply is not the kind of transaction Congress intended Section 83 to encompass. Davis, Grey and Electric were not employees of Fisk, and the methods by which companies choose to enrich their stockholders was not within Congress' contemplation at the time Congress drafted and enacted Section 83.

Centel argues that Section 83 should be broadly applied in spite of the limits suggested by its legislative history and cites language in opinions encouraging an expansive interpretation of Section 83. See, e.g., *Alves v. Commissioner*, 79 T.C. 864, 876 (1982) ("Congress * * * has clearly expressed the intention that Section 83 is to have the broadest application."), affirmed, 734 F.2d 478 (9th Cir.1984).

The cases cited by Centel, however, extend application of Section 83 only to transfers made within an employer-employee relationship. See *Alves*, 79 T.C. at 864 (Section 83 applies to restricted stock options issued to company vice-president); *Bagley v. Commissioner*, 85 T.C. 663 (1985) (options granted to employee as part of employment contract), affirmed, 806 F.2d 169 (8th Cir.1986); *Sakol v. Commissioner*, 67 T.C. 986 (1977) (options granted to unidentified employee), affirmed, 574 F.2d 694 (2nd Cir.1978), certiorari denied, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168; *Cohn v. Commissioner*, 73 T.C. 443 (1979) (options granted to independent contractor). Stock options are only transferred "in connection with the performance of services" when an

employer transfers options to an employee or independent contractor. No known case applies Section 83 to a company's grant of options to a mere shareholder.

Centel claims specifically that it was erroneous for the Tax Court to conclude that guarantees are not services. While admitting that no case directly addresses whether guarantees are services in the context of Section 83, Centel argues that the so-called "reasonable compensation" cases, cases arising under Section 162(a)(1), prove that guarantees are services for Code purposes. In "reasonable compensation" cases, employers try to categorize amounts paid to employee-shareholders as deductible compensation rather than as non-deductible dividends. To be deductible as compensation, the payment must be (i) reasonable in amount and (ii) purely for services. Centel cites "reasonable compensation" cases in which courts upheld the reasonability of compensation given to employee-shareholders who had offered, among other things, to guarantee debts of their company. It reasons that in these cases the courts at least implicitly held that the making of a guarantee is the performance of a service.

The "reasonable compensation" cases do not aid Centel's argument because, as the Tax Court noted, they all involve employee-furnished guarantees and not guarantees offered by stockholders like Davis, Grey and Electric. See *Owensby v. Kritikos, Inc. v. Commissioner*, 819 F.2d 1315 (5th Cir.1987) (guarantees given by president and executive vice-president); *B.B. Rider Corp. v. Commissioner*, 725 F.2d 945 (3rd Cir.1984) (guarantees given by president/chief financial officer and vice-president/office manager); *Shotmeyer v. Commissioner*, 40 T.C.M. (CCH) 589 (1980) (guarantees given by president/chief executive officer); *Ledford Construction Co. v. Commissioner*, 36 T.C.M. (CCH) 858 (1977) (guarantees given by president/treasurer); *Allison Corp. v. Commissioner*, 36 T.C.M. (CCH) 689 (1977) (guarantees given by officer/director). At most these cases stand for the proposition that employees can perform services by offering guarantees. The courts typically do not examine closely the issue of whether the compensation was purely for services, presumably because it was reasonable to assume that the employees involved did offer services to their employers. Most of the cases focus on the "reasonableness" of the compensation. The cases do not explicitly consider whether loan guarantees constitute the performance of services. Certainly none of these "reasonable compensation" cases holds that a non-employee stockholder can perform a service by offering guarantees.

We agree with the Tax Court that *Bank of America v. United States*, 680 F.2d 142 (Ct.Cl.1982), furnishes a better analysis of how to characterize guarantees than the "reasonable compensation" cases. In *Bank of America*, the issue was whether certain commissions received by a taxpayer bank were U.S. source income or foreign source income for Section 901 purposes. The bank received the commissions partly in return for its confirmation of letters of credit issued by foreign banks. In order to resolve the question of whether the commissions were foreign- or U.S.-sourced, the court analogized the commissions to the two classes of income listed in Sections 861 and 862, interest income and personal income. The court declined to categorize the commissions as income derived from the performance of personal services, reasoning that the bank, in substituting its credit for that of other banks, engaged in what resembled a loan transaction rather than the performance of services. The court wrote:

> Thus, from the moment of confirmation the plaintiff has made an enforceable promise to pay regardless of any change in the foreign bank's financial condition. As in acceptance and loan transactions, the plaintiff here has acted as an intermediate, has assumed the risk of default of the foreign bank, and has assured the draft's holder of payment.
>
> * * * *Thus, it is apparent what plaintiff was really charging for was not the services performed but the substitution of its own credit for that of the foreign bank. The predominant feature of the confirmation transactions was the substitution of plaintiff's*

*credit for that of the foreign banks.* The services performed were subsidiary to this. Therefore, due to the similarities between a confirmation and a loan transaction, we hold that the confirmation commissions should be sourced by analogy to interest. 680 F.2d at 149–150 (emphasis supplied).

Applying the reasoning of *Bank of America,* it is apparent that Davis, Grey and Electric did not perform any "service" to Fisk solely by guaranteeing Fisk's loans. They substituted their credit for that of Fisk, and Fisk granted them warrants in recognition of the increased risk they assumed as stockholders. They did not receive warrants in return for any "service" they supplied to Fisk.

We agree with the Tax Court's conclusion that stockholders Davis, Grey and Electric offered guarantees to protect their own investment in Fisk rather than to perform "services" within the meaning of Section 83. Every relevant source supports the employee/stockholder distinction drawn by the Tax Court. The Tax Court's finding that Centel did not issue warrants in connection with any service performed by employees is not clearly erroneous.

*C. The Applicability of Treasury Regulations § 1.61–15.*

 Centel argues that even if Section 83 does not apply to its warrant transaction, Treasury Regulations § 1.61–15 authorizes its 1980 deduction.

Centel's last argument requires some explanation of the relevant regulations. Section 83 was enacted in 1969 to govern the treatment of nonqualified stock options [7] received in connection with the performance of services. Similar options granted prior to 1969 are properly treated under Treas.Reg. § 1.421–6 and § 1.61–15. Section 1.421–6 provides:

---

**7.** A "nonqualified" stock option is any option which does not qualify for preferential tax treatment under Sections 421 and 422 of the Code.

**8.** Section 1.83–8 does not aid Centel. It provides exceptions to the applicability of Section 83 for certain transactions that otherwise would fall within the scope of Section 83. It allows transactions occurring after June 30, 1969 to be governed by Section 1.61–15 if they derived

---

(a) Scope of section. (1) If an employer or other person grants to an employee or other person for any reason connected with the employment of such employee an option to purchase stock of the employer or other property, * * *, then this section shall apply. * * *

(2) This section is applicable to options granted on or after February 26, 1945, and before July 1, 1969 * * *.

Treas.Reg. § 1.421–6 (1959).

Section 1.61–15 supplements Section 1.421–6 by extending to "any person" the rules of § 1.61–15. It specifies:

Options received as payment of income:

(a) In general. Except as otherwise provided in § 1.61–2(d)(6)(i) (relating to certain restricted property transferred after June 30, 1969), if any person receives an option in payment of an amount constituting compensation of such person (or any other person), such option is subject to the rules contained in § 1.421–6 for purposes of determining when income is realized in connection with such option and the amount of income. Treas.Reg. § 1.61–15 (as amended in 1978).

Centel argues that the "any person" language in Section 1.61–15 expands the section's application beyond employees possibly to encompass stockholder-guarantors. Centel also believes that Section 1.61–15 can be applied to post–1969 transactions, because the more limited Section 83 is not a complete substitute for Section 1.61–15.

Section 1.61–15 does not apply to transfers of property made after June 30, 1969. Section 1.61–2(d)(6)(i) explicitly provides that Section 1.61–15 will not apply to "the transfer of property * * * after June 30, 1969 [the effective date of Section 83], unless 1.83–8 (relating to the applicability of section 83 and transitional rules) applies." [8]

---

from an earlier transaction, for example. The warrants in this case do not qualify for Section 83 treatment, nor was their issuance in some way derived from an earlier transaction that would make an otherwise unqualified transaction subject to Section 1.61–15.

Even if Section 1.61–15 did apply to the post-1969 transfers of property, it would not entitle Centel to its 1980 deduction. Centel argues that Section 1.61–15 is broader in scope than Section 83 because it applies to transfers made to "any person." Centel is mistaken. Section 1.61–15, taken together with Section 1.421–6, encompasses the same transactions as Section 83 and the regulations formulated under that section. "The regulatory scheme is such that the provisions of sections 1.61–15 and 1.421–6, Income Tax Regs., govern property transferred on or before June 30, 1969, and *the identical rules* of section 1.83–7, Income Tax Regs., apply if the property was transferred after June 30, 1969." *Pagel, Inc. v. Commissioner*, 91 T.C. 200, 217 (1988) (emphasis supplied), affirmed on other grounds, 905 F.2d 1190 (8th Cir.1990).

Like Section 83, Section 1.61–15 applies only to transfers of property made in connection with the performance of services by employees or independent contractors. The "any person" language upon which Centel focusses is not as delimiting as Centel argues. The regulation itself states that the "any person" language was included "for example, [to] make[ ] the rules of § 1.421–6 applicable to options granted in whole or partial payment for services of an independent contractor." Section 1.61–15 thus expanded Section 1.421–6 to apply to transfers made to independent contractors. There is no basis for a belief that Section 1.61–15 applies to options granted to stockholders like Davis, Grey and Electric.[9]

In sum, because Section 1.61–15 does not apply to post-1969 transactions or to transfers of options to non-employees, Centel's reliance on the section is unjustified.

## III. CONCLUSION

Had we decided that Section 83 governed the transfer of warrants in this case, it would have been necessary under Treasury Regulations § 1.83–7 to address the issue of whether those warrants had a "readily ascertainable" value at the time of issuance. Since we conclude that Section 83 is inapplicable, that inquiry is unnecessary.

For all the foregoing reasons, the decision of the Tax Court is affirmed.

---

**9.** Section 1.61–2(d)(6) provides further evidence that the scope of Section 1.61–15 is no broader than that of Section 83. That subsection, which restricts the application of Section 1.61–15 to transactions occurring on or before June 30, 1969, is entitled:

(6) Certain property transferred, premiums paid, and contributions made *in connection with the performance of services* after June 30, 1969.

Section 1.61–15 thus contains the same limiting language that Section 83 does.